IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

F I L E
MAY 2 7 2009
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| JUAN CARLOS MARROQUIN, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 08-391 |
| EXXON MOBIL CORPORATION d/b/a ExxonMobil Lubricants & Petroleum Specialties Company, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant's Motion for Summary Judgment; Plaintiff's Motion in Limine; Plaintiff's Motion for Ruling on Objections to Witnesses, Exhibits and Deposition Designations Filed by the Parties; Plaintiff's Motion to Lift Protective Order with Sealing Provisions; Defendant's Motion in Limine; Defendant's Motion for Ruling on Objections to Witnesses, Exhibits, Deposition Designations, and Counter-Deposition Designations; and a Joint Motion for the Court's Permission to Use Evidence Presentation Equipment in the Courtroom for Trial.

Plaintiff, Juan Carlos Marroquin, brought this suit against Defendant, his former employer – the ExxonMobil Lubricants & Petroleum Specialties Company – on April 24, 2008.  Plaintiff

alleges that Defendant, in violation of 42 U.S.C. § 1981, discriminated against him on the basis of his race and/or national origin, affecting the terms, conditions, and privileges of his employment, and resulting in his discriminatory termination. Plaintiff also claims that employees of Defendant knowingly made materially false and misleading statements about the circumstances of his termination, conduct that constitutes defamation and defamation per se under Virginia law.

On April 26, 2007, Defendant terminated Plaintiff's employment. At the time of his termination, Plaintiff had worked for Defendant for approximately 20 years and held the position of Americas Marketing Manager. He was Defendant's highest ranking United States executive of Hispanic descent.

Plaintiff's termination followed Defendant's internal investigation of a marketing event co-sponsored by Defendant and held in Miami, Florida during the weekend of the National Football League's 2007 Super Bowl game (the "Super Bowl"), from Friday, February 2, 2007 through Monday, February 5, 2007. This investigation found that in the planning and execution of the event Plaintiff failed to exercise appropriate managerial oversight and violated several company policies. Following the investigation, Defendant terminated Plaintiff's employment. Defendant also terminated, disciplined, or forced the resignation of several of Plaintiff's subordinates and supervisors for their

behavior with respect to the event.  Among the employees
disciplined or terminated by Defendant for their planning of and
participation in the events of the Super Bowl weekend, Plaintiff
was the only non-caucasian.

In late 2006, Cadillac, an automobile manufacturer and
client of Defendant's, approached Defendant about co-sponsoring a
charitable celebrity go-kart race to be held on Saturday,
February 3, 2007 - the day before the Super Bowl.  When this co-
sponsorship opportunity arose, Defendant's Marketing Group was
actively participating in an effort to finalize a financially
significant business arrangement with Cadillac.  The co-
sponsorship, by providing a forum for Defendant's executives to
socialize with Cadillac dealers, seemed like an opportunity to
develop the existing relationship with Cadillac and generate
additional business.  Furthermore, the media coverage of the
event promised additional financial benefits.  To capitalize on
these opportunities, it was proposed that the Marketing Group,
under the management of Plaintiff, move forward with support of
the co-sponsorship.

Plaintiff delegated organization of the event to his
subordinate, Benjamin Tait.  On December 8, 2006, Plaintiff
received an email from Tait, confirming that all the endorsements
necessary to commit to the event had been received from
Defendant's tax, legal, and public affairs departments.

Plaintiff agreed to Defendant's participation as a co-sponsor and approved the cost.

Defendant and Cadillac evenly split the $400,000.00 cost of the co-sponsorship. For its $200,000.00, Defendant received shared naming of the event - the "Cadillac / Mobil 1 Grand Prix" - and was entitled to advertise its participation. Defendant also received four tickets to the Super Bowl. Defendant would later receive two additional Super Bowl tickets from its external marketing company at no additional cost.

Around the first week of January 2007, Plaintiff discussed the co-sponsorship with Mike Mullins, Defendant's Vice President of Marketing. He asked Mullins if he planned to attend the co-sponsored event and the Super Bowl game the following day. He also asked Mullins to speak with Defendant's President, Gerald Kohlenberger, about his intended participation. Mullins told Plaintiff that he would do so, and that if he and Kohlenberger attended the game, they would each bring a guest.

Following this conversation with Mullins, Plaintiff instructed Tait to contact Cadillac about obtaining four additional tickets to the Super Bowl game. Cadillac responded that it could not provide additional tickets as part of the co-sponsorship package, but that four additional tickets could be purchased. Plaintiff then directed Tait to purchase those tickets at a cost of approximately $13,000.00.

4

During the week of January 22, 2007, Mullins confirmed with Plaintiff that he and Kohlenberger would attend the Super Bowl game, each with a guest.  Plaintiff never informed Mullins or Kohlenberger that he had purchased four Super Bowl tickets in addition to those already obtained through the co-sponsorship.

As planning for the co-sponsorship continued, Plaintiff's subordinate, Tait, solicited tickets to private parties scheduled for the same weekend.  He contacted Cadillac and Defendant's advertising agency about obtaining eight tickets to parties that would be hosted by Defendant's vendors – ESPN and Sports Illustrated – on the evening of Saturday, February 3, 2007.  Tait eventually secured tickets to the ESPN party from the advertising agency.

On the evening of Friday, February 2, 2007, Plaintiff arrived in Miami for the weekend's events.  Plaintiff's wife and son accompanied him for the weekend.  Over the course of the weekend, Plaintiff and his family made a number of charges to the hotel room – including meals and a pay-per-view movie – that were later charged to a corporate credit card issued by Defendant to Plaintiff.

While in Miami, Plaintiff participated in two events using tickets obtained through Defendant.  He attended the ESPN party with his wife using the tickets solicited by Tait, and attended the Super Bowl game with his son.

Shortly after returning from Miami, Defendant's Audit
Division initiated an investigation into the actions of employees
who organized, supervised, and participated in the Super Bowl
weekend's events.

Because Kohlenberger conducted no company business or even
spoke with any Cadillac dealers while at the Super Bowl, upon
returning from Miami, he instructed his assistant to reimburse
Defendant for his tickets.  When his assistant contacted
Plaintiff to ask how Defendant could be reimbursed, Plaintiff
responded that repayment was unnecessary because the tickets were
provided to Defendant as part of its co-sponsorship.

Kohlenberger nonetheless submitted a check for the face
value of the tickets to Defendant's Controller.  When a
Controller employee contacted Plaintiff to discuss the matter,
Plaintiff explained that because the Super Bowl game was an event
sponsored by Defendant, Kohlenberger should not have to pay for
the tickets personally.

Bud Carr, a Senior Staff Auditor with more than 20 years of
experience was assigned to the investigation.  He concluded that
four of Defendant's employment policies were implicated by the
actions he discovered - Conflicts of Interest, Ethics, Gifts and
Entertainment, and Corporate Assets.

Following this investigation, J. Stephen Simon, Defendant's

6

Senior Vice President and member of its Board of Directors, considered Carr's report, reviewed the policy violations, and made disciplinary determinations.  On April 26, 2007, the employees investigated by Carr were called to the office of Defendant's Executive Vice President, James Marcogliese, where they were informed of Defendant's disciplinary decisions.

Several employees, including Jeffrey Eckstein, the manager of strategic accounts in Defendant's Sales Division, and his subordinate Jeffrey Martin, received written reprimands.

Defendant gave Mullins, Plaintiff's immediate supervisor, the option of resignation or termination.  Mullins' forced resignation caused him a significant financial loss in forfeited shares of Defendant's restricted stock.  He also lost his discretionary bonus.

Defendant determined that Kohlenberger's violation of company practices and procedures was limited to his attending the Super Bowl game with his son using tickets paid for by Defendant. Yet, having lost faith in his ability to lead the company, Defendant forced Kohlenberger to retire at age 55.  In February 2008, Kohlenberger retired.  He received no restricted stock in the last year of his employment.

Defendant immediately terminated Plaintiff, Tait, and Brad Onofrio, another of Plaintiff's subordinates.  Plaintiff's

7

termination letter explained that he failed to exercise adequate management oversight of the weekend's events and violated company policy.

Following these meetings, the terminated employees were taken back to their offices.  They were given an opportunity to collect their personal belongings and were then escorted from the premises.

Summary judgment is appropriate where there is no genuine issue as to any material fact.  See Fed. R. Civ. P. 56(c).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Mere speculation by the non-moving party "cannot create a genuine issue of material fact."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985); see also Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

8

(1986).

Claims brought under 42 U.S.C. § 1981 are subject to the same method of proof as claims brought under Title VII.  <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 n. 1 (4th Cir. 2002).  The plaintiff begins with the burden of establishing a prima facie case of discriminatory termination.  If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the plaintiff's termination.  If the defendant produces this non-discriminatory rationale for the termination, the plaintiff must then prove by a preponderance of the evidence that his former employer's stated reason for the adverse employment action was merely pretextual.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973); <u>Holland v. Wash. Homes, Inc.</u>, 487 F.3d 208, 213-14 (4th Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 955 (2008).

In a case that alleges racially discriminatory discipline or discharge and requires a comparison of disciplinary actions against different employees, plaintiff establishes a prima facie case by showing that: (i) he is a member of a protected class; (ii) his prohibited conduct "was comparable in seriousness" to that of employees outside his protected class; and (iii) his discipline was more severe than that enforced against the employees outside his protected class.  <u>Cook v. CSX Transp. Corp.</u>, 988 F.2d 507, 511 (4th Cir. 1993).

9

Defendant's reasons for Plaintiff's termination are captured in a termination letter and in an internal audit that preceded Defendant's disciplinary actions. Defendant's letter of termination to Plaintiff stated:

> Management has concluded that you failed to exercise adequate management oversight of the Company's participation in activities related to the Super Bowl and that in addition you took specific actions that violated established practices and procedures of the Corporation. Those specific actions included:
>
> - Approving an improper accrual into 2006 of $73,000 for services that the Company did not receive until 2007;
> - Taking your son to the game, without your supervisor's approval, on a ticket paid for by the Company;
> - Charging to the Company meals for your family; and
> - Permitting your subordinates to solicit a Company customer and several vendors for tickets to various Super Bowl events.

First, Plaintiff's actions had violated Defendant's Corporate Assets policy. The audit determined that in addition to the four Super Bowl tickets received through the co-sponsorship, Plaintiff authorized the purchase of four more Super Bowl tickets with corporate funds - an additional expense of over $13,000.00. Plaintiff charged all of his room expenses, including expenses for his wife's and son's meals, to his corporate credit card. Company policy authorized use of that card for business purposes only.

Second, the audit cited a violation of Defendant's Conflict

of Interest policy.  The audit found that Plaintiff knew his
subordinates were soliciting tickets to the Super Bowl and
private parties from Defendant's customers and vendors.

Third, the audit determined that Plaintiff violated
Defendant's Gifts and Entertainment policy.  The audit found that
Plaintiff did not obtain prior approval before bringing his son
to the Super Bowl game on a company-paid ticket, and that he and
his wife attended a private Super Bowl party using $500.00
tickets solicited from Defendant's advertising agency.

Finally, the audit cited instances in which Plaintiff
violated Defendant's Ethics policy.  The audit found that Tait
accrued $73,672.00 for the 2007 Super Bowl weekend and co-
sponsorship to the 2006 marketing budget and that Plaintiff
approved this accrual.  The audit also found that Plaintiff
misled management regarding the source and value of the
additional Super Bowl tickets.

Plaintiff must show that he is a member of a protected
class, and that employees outside of his protected class engaged
in misconduct of comparable seriousness to his own, but received
lesser discipline.  See Moore v. Charlotte, 754 F.2d 1100 (4th
Cir. 1985).  Plaintiff claims that other employees engaged in the
same conduct and received substantially lesser discipline.
However, the record shows that those who received comparatively
lenient discipline did not in fact engage in conduct comparable

11

to Plaintiff's, while those who behaved similarly were subject to severe disciplinary action. Plaintiff was the supervisor of those who Defendant determined had seriously violated company policies. Like them, he was immediately terminated with no option of resignation. Plaintiff was the subordinate of those whose behavior violated company policy or fell short of managerial expectations, but who did not actively participate in the planning and execution of the co-sponsorship or the other events of the Super Bowl weekend. Those individuals were disciplined severely but not immediately terminated.

The first group of disciplined employees includes those who received oral and written reprimands - Jeffrey Eckstein and his subordinate Jeffrey Martin. Though Plaintiff attempts to draw several comparisons between himself and Eckstein, the record does not support these comparisons. The Plaintiff had a unique responsibility for the organization and execution of the co-sponsorship. Plaintiff approved the co-sponsorship and delegated the organization and execution of the event to his subordinate Tait.

Plaintiff claims that Eckstein solicited additional Super Bowl tickets from Defendant's advertising agency, but the record does not support this assertion. Defendant's audit found that Eckstein's only violation of company policy was to attend a private Super Bowl party with tickets solicited from Defendant's

12

advertising agency.

The second group of disciplined employees includes Plaintiff and those others who were immediately terminated.  Defendant concluded that Plaintiff, along with Tait and Onofrio, violated several company policies.  Like Tait, Plaintiff charged personal expenses to Defendant and attended a private Super Bowl party with tickets solicited from Defendant's advertising agency. Plaintiff was also found to have attended the Super Bowl game with his son on a company-paid ticket without prior approval.

Defendant also concluded that Plaintiff's improper supervision of Tait represented a failure in management. Plaintiff knew of Tait's solicitation of tickets for the Super Bowl and private parties.  Yet he did not correct Tait's actions, even though this leveraging of Defendant's advertising relationship with vendors violated company policy.  Plaintiff also approved Tait's manipulated accrual of expenses from the 2007 Super Bowl weekend to the 2006 budget.

The third and final group of disciplined employees includes Mullins and Kohlenberger.  Defendant determined that like Plaintiff these executives did use improper judgment and exercised inadequate oversight of their subordinates with respect to the co-sponsorship.  Yet they did not participate in Plaintiff's authorization and organization of the co-sponsorship. Furthermore, their specific violations of company policies were

13

not as severe as Plaintiff's.  They did not charge personal

expenses to the corporate credit card.  Though they brought

guests to the Super Bowl without permission, they did not

knowingly attend the game using one of the four additional

tickets purchased by Defendant, and they did not authorize the

purchase of the additional Super Bowl tickets.  In fact,

Defendant initiated its investigation of this matter following

Kohlenberger's attempt to mitigate any perceived wrongdoing by

reimbursing the company for his tickets.

In spite of its conclusion that their culpability in this

matter was less significant than Plaintiff's, Defendant demanded

both Kohlenberger's and Mullins' involuntary separation from the

company.  Defendant's investigation found that Mullins' violation

of company policies was more significant than Kohlenberger's, and

in his case separation was immediate. Kohlenberger's forced

resignation came the following year.  Both Kohlenberger and

Mullins suffered significant financial losses due to their forced

separation from the Corporation.

Establishing a prima facie case of discriminatory

termination is not a "precise, mechanically-imposed formulation."

Cook, 988 F.2d at 512.  "[T]he burden is on the plaintiff to

prove a set of circumstantial facts, which, in the absence of a

legitimate non-discriminatory explanation, leads one to conclude

with reasonable probability that the action taken against him was

the product of discrimination."  Id.  Plaintiff cannot establish
a prima facie case of disparate treatment merely by singling out
"one prior instance of less severe treatment of a person outside
the protected class . . . ."  Id. at 508-09.  The Court must
examine the "entire record . . . rather than seizing upon a
particular piece of evidence contained within it."  Id. at 512.

     Plaintiff has no facts that would raise an inference of
discriminatory intent on Defendant's part.  In its entirety, the
record shows that the discipline Plaintiff received was no more
severe than that meted out to employees outside of his protected
class whose behavior was of comparable seriousness.  The
investigation found that Plaintiff's violations of company
policies were uniquely severe actions distinguishing him from his
fellow employees.  Plaintiff alone authorized the purchase of the
four additional Super Bowl tickets at significant expense to
Defendant.  Plaintiff did so, at least in part, to facilitate a
family member's attendance at the Super Bowl, and then misled his
supervisors about the source and cost of those tickets.

     Even assuming that Plaintiff established a prima facie case,
Defendant has articulated a non-discriminatory reason for
Plaintiff's termination.  The burden, therefore, remains with
Plaintiff "to prove by a preponderance of the evidence that the
employer's stated reasons 'were not its true reasons, but were a
pretext for discrimination.'"  Holland, 487 F.3d at 214 (quoting

15

<u>Hill v. Lockheed Martin Logistics Mgmt.</u>, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).

This court must weigh "the probative value of the proof that the employer's explanation is false." <u>Holland</u>, 487 F.3d at 215, <u>quoting</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149 (2000). Summary judgment is appropriate if the Plaintiff "created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." <u>Id.</u>, <u>quoting</u> <u>Reeves</u>, 530 U.S. at 148.

This Court must not substitute its judgment for the good faith decisions of Defendant in exercising discipline over its employees. As in Title VII litigation, a federal court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." <u>DeJarnette v. Corning, Inc.</u>, 133 F.3d 293, 298-99 (4th Cir. 1998) (internal quotation marks omitted). In measuring the seriousness of employee misconduct, this Court must take note that an employer is free to develop its own criteria for employment decisions, so long as they are not race-based. <u>Beall v. Abbott Labs.</u>, 130 F.3d 614, 619 (4th Cir. 1997). If the employer's reason for termination is not forbidden by law, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the

16

reason for the plaintiff's termination." DeJarnette, 133 F.3d at 299 (internal quotation marks omitted).

Defendant presents non-discriminatory reasons for Plaintiff's termination. In part because of the institutional mechanisms Defendant had in place to review employee misconduct, Defendant's stated reasons for the termination were "clear and reasonably specific." Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1288 (4th Cir. 1985) (quoting Tex. Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)). The matter was referred to Defendant's Audit Department, where a career auditor was assigned to the case and produced a thorough report for use by Defendant's executives when making their disciplinary decisions.

Plaintiff must produce some evidence that Defendant's proffered reasons for his termination were a pretext for underlying discrimination. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). Plaintiff makes a series of procedural objections to the manner in which Defendant conducted the investigation. He also suggests a discriminatory motive, claiming that Carr and Simon knew he was Hispanic and that Carr "clearly had an agenda in conducting the investigation, and made

17

the recommendations as to who had, or had not, committed policy violations." There is simply no evidence in the record, however, suggesting that Plaintiffs' race or ethnicity had any bearing on Defendant's investigation or disciplinary determinations.

Plaintiff's second claim alleges defamation and defamation per se. Plaintiff's Complaint identifies seven allegedly defamatory statements. In his Opposition to Summary Judgment, however, Plaintiff restricts his argument to only two of these statements. First, immediately following Plaintiff's termination, Kohlenberger allegedly told Plaintiff's assistant that Plaintiff was terminated for doing "something very bad." Second, following a business meeting in Mexico, Jeff Martin allegedly told a fellow employee that the co-sponsorship was "inappropriate" and established an "improper" commitment to Cadillac in terms of future business dealings.

To prove defamation under Virginia law, Plaintiff must demonstrate (i) publication of, (ii) an actionable statement with, (iii) requisite intent. Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). See generally Gazette, Inc. v. Harris, 325 S.E.2d 713 (Va. 1985), cert. denied, 472 U.S. 1032 (1985). To prevail on his claim for defamation, Plaintiff must prove by a preponderance of the evidence not only that the allegedly defamatory statements are false, Jordan v. Kollman, 612 S.E.2d 203, 207 (Va. 2005), but that they are defamatory, so

18

"harm[ing] the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Chapin, 993 F.2d at 1092 (quoting Restatement (Second) of Torts § 559 (1977)). If the statements at issue were objectively true, not defamatory, or protected expressions of opinion, there is no actionable defamation. Am. Commc'ns. Network, Inc. v. Williams, 568 S.E.2d 683, 686 (Va. 2002). Whether a statement is actionable is a matter of law to be determined by this Court. Jordan, 612 S.E.2d at 206-07 (citing Chaves v. Johnson, 335 S.E.2d 97, 101 (Va. 1985)). Plaintiff does not produce any evidence demonstrating that these statements were false. While he objects to his termination and to his former employer's characterization of his behavior, it is objectively true that Defendant fired Plaintiff after an investigation found that he violated a number of corporate policies and misled supervisors and investigators about his wrongdoing. The statements Plaintiff cites are reasonable short-hand descriptions for the causes of his dismissal. Yet to substantiate his claim for defamation, Plaintiff does little more than reassert that the documented investigation and stated rationale for his termination were a pretext for discrimination.

Also, these statements are not defamatory. A defamatory statement must "make the plaintiff appear odious, infamous, or ridiculous," and must be more than "[m]erely offensive or

unpleasant." Chapin, 993 F.2d at 1092 (internal quotations omitted). While perhaps upsetting to Plaintiff, he is not able to show that these mild assessments of his termination diminished his reputation to anyone.

Even if Plaintiff produced evidence demonstrating that these statements were defamatory, they would be protected expressions of opinion. Statements of opinion are "relative in nature and depend largely upon the speaker's viewpoint," whereas statements of fact are those which are "capable of being proven true or false." Fuste v. Riverside Healthcare Ass'n, Inc., 575 S.E.2d 858, 861-62 (Va. 2003).

The statements cited by Plaintiff are vague and subjective, and they do not contain a "provably false factual connotation." Fuste, 575 S.E.2d at 861, citing Yeagle v. Collegiate Times, 497 S.E.2d 136, 137 (Va. 1998). The characterization of Plaintiff's conduct as "very bad" or "inappropriate," or creating an "improper" commitment with a customer are expressions of opinion that rest on each speaker's perspective. See, e.g., Am. Commc'ns Network, Inc., 568 S.E.2d at 686 (holding that a statement that management team was replaced due to "failure to establish effective operations" was either objectively true or opinion). The comments cited by Plaintiff were an opinion of the scope and magnitude of Plaintiff's wrongdoing that cannot be proven false.

Plaintiff's claim that these statements are also defamation

20

per se fails.   Statements constitute defamation per se when they
(i) impute to a person unfitness to perform the duties of his
employment, or want of integrity in the discharge of those
duties; or (ii) prejudice such a person in his or her profession
or trade.   Tronfeld v. Nationwide Mut. Ins. Co., 636 S.E.2d 447,
449-50 (Va. 2006).   To be actionable under this test, a statement
must be "necessarily hurtful in its effect upon plaintiff's
business and must affect him in his particular trade or
occupation," and there must be "a nexus between the content of
the defamatory statement and the skills or character required to
carry out the particular occupation of the plaintiff."   Fleming
v. Moore, 275 S.E.2d 632, 636 (Va. 1981) (internal quotation
omitted).   The vague statements of Kohlenberger and Martin do not
establish the required nexus with Plaintiff's particular
employment responsibilities or ability to perform his job that
would support Plaintiff's claim of defamation per se.

     For the reasons stated above, Defendant is entitled to
summary judgment on Plaintiff's claim of discriminatory
termination, and on the claim of defamation and defamation per
se.   An appropriate order shall issue.

21

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
May _27_, 2009

22